Joshua M. Dickey
Nevada Bar No. 6621
Paul C. Williams
Nevada Bar No. 12524
**BAILEY❖KENNEDY**
8984 Spanish Ridge Avenue
Las Vegas, Nevada 89148-1302
Telephone: 702.562.8820
Facsimile: 702.562.8821
JDickey@BaileyKennedy.com
PWilliams@BaileyKennedy.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| Sunrise Hospital and Medical Center, LLC; and Midwest Division – OPRMC, LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>Prime Healthcare and Keenan & Associates,<br><br>Defendants. | Case No.<br><br>**Complaint**<br><br>**Jury demanded** |

Plaintiffs, Sunrise Hospital and Medical Center, LLC, d/b/a Sunrise Hospital & Medical Center ("Sunrise") and Midwest Division – OPRMC, LLC d/b/a Overland Park Regional Medical Center ("Overland Park," or collectively with Sunrise, "Plaintiffs" or "Hospitals"), hereby complain of Defendants, Prime Healthcare ("Prime") and Keenan & Associates ("Keenan") (collectively, "Defendants") as follows:

### Statement of facts

#### A. Parties

1.     Plaintiff Sunrise is a Delaware limited liability company operating in Clark County, Nevada. Sunrise's sole member is AC Med, LLC, a Delaware limited liability company. AC Med, LLC has one member, Healthtrust, Inc. – The Hospital Company, a Delaware corporation with its

principal place of business in Davidson County, Tennessee. For purposes of diversity jurisdiction, Sunrise is a citizen of Delaware and Tennessee.

2.    Plaintiff Overland Park is a Delaware limited liability company operating in Johnson County, Kansas. Overland Park's sole member is Hospital Corp., LLC, a Delaware limited liability company. Hospital Corp., LLC has one member, HCA Squared, LLC, a Delaware limited liability company. HCA Squared, LLC has one member, Healthtrust, Inc. – The Hospital Company, a Delaware corporation with its principal place of business in Davidson County, Tennessee. For purposes of diversity jurisdiction, Overland Park is a citizen of Delaware and Tennessee.

3.    Prime is a California corporation doing business in Nevada and Kansas. This lawsuit arises from Prime's business in Nevada and Kansas. Prime's principal place of business is in California, located at 3115 Ocean Front Walk, Suite 301, Marina Del Rey, California 90292. Prime operates one or more healthcare facilities in the State of Nevada and employs people in Nevada to work at such facilities. Prime, as an employer, offers participation in a group health plan to its employees (the "Prime Members"). The Subscribers (defined below) are, or were at the time when services were provided, Prime Members. As explained below, Prime Members are not confined to the State of California; rather, Prime Members live, work, and receive medical services for which Prime is financially responsible in other states, including Nevada.

4.    Keenan is a California corporation doing business in Nevada and Kansas. This lawsuit arises from Keenan's business in Nevada and Kansas. Keenan's principal place of business is in California, located at 2355 Crenshaw Boulevard, Suite 200, Torrance, California 90501. Keenan maintains a registered agent in the State of Nevada for service of process: CT Corporation System, 701 S. Carson Street, Suite 200, Carson City, Nevada 89701. Keenan is a third-party administrator ("TPA") of health plan benefits for Prime. Keenan contracted with Prime to administer Prime's group health plan for Prime and the Prime Members. In this case, the Subscribers are, or were at the time services were rendered, Prime Members whose Prime plans are or were administered by Keenan. Accordingly, the Prime Members for which Keenan serves as TPA are not confined to the State of California; rather, the Prime Members live, work, and receive medical services for which Keenan is financially responsible in other states, including Nevada.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

5.      This Court has personal jurisdiction over Prime and Keenan because they conduct substantial business in Nevada, and a substantial part of the events or omissions giving rise to the Hospitals' claims occurred here. Further, as explained below, Prime and Keenan are bound by a Facility Agreement between Sunrise and Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield and HMO Colorado, Inc. d/b/a HMO Nevada ("Anthem NV") (eff. Oct. 1, 2015) (as amended, the "Anthem NV Agreement") that applies to two of the claims at issue in this Complaint, and the Anthem NV Agreement is governed by Nevada law.[1] Further, Prime and Keenan insure and/or administer health plans and health insurance policies issued to, and covering, Nevada residents, including two of the Subscribers at issue in this case to whom Sunrise provided medical services. These two Subscribers received medical services in the State of Nevada. Prime and Keenan issued and/or administered health plans to/for Prime Members residing and working in Nevada, knowing of the possibility of having to resolve disputes under the Anthem NV Agreement under Nevada law. Prime and Keenan therefore do business in the State of Nevada for purposes of personal jurisdiction, and it was reasonably foreseeable that they would be haled into court in Nevada for their actions in connection with insuring and administering health plans that cover health services provided to two of the Subscribers, who are or were Prime Members, in Nevada. Additionally, this Court has personal jurisdiction because the Employee Retirement Income Security Act of 1974 ("ERISA") provides for nationwide service of process, and Defendants have sufficient minimum contacts with the United States, as they do business in and are citizens of the United States. *See* 29 U.S.C. § 1132(e)(2).

6.      This Court has subject-matter jurisdiction because this dispute is between citizens of different states (Plaintiffs are citizens of Delaware and Tennessee, and Defendants are citizens of California) and involves an amount in controversy of greater than $75,000. *See* 28 U.S.C. § 1132(a). This Court also has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs assert a claim under ERISA, 29 U.S.C. §§ 1001, *et seq.*, that arises under the laws of the

---

[1] The Agreements (defined below) contain confidentiality provisions which prevent Plaintiffs from attaching them to this Complaint and from quoting language directly from the Agreements. The Agreements will be produced pursuant to a valid discovery request once a protective order has been entered in this case.

United States. Further, this Court may exercise supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in the District of Nevada pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district. As described below, Sunrise, which provided medical services to two of the Subscribers at issue in this Complaint, is located in Las Vegas, Nevada, thus making venue proper under 28 U.S.C. § 1391(b)(2). Venue is also proper under 29 U.S.C. § 1132(e)(2), because Plaintiffs have asserted a claim for breach of the Agreements (defined below), breach of the health plans at issue, and for equitable relief. Defendants' actions giving rise to Plaintiffs' claims took place at least in part in this judicial district, as Prime and Keenan denied reimbursement for medical services provided in the District of Nevada to two of the Subscribers, who are or were Prime Members. Further, venue is proper over any parts of Plaintiffs' claims related to events or omissions that occurred outside of this judicial district pursuant to the doctrine of pendent venue.

## B.    FACTUAL BACKGROUND

### I.    THE AGREEMENTS AND THE BLUECARD PROGRAM

8.      This case concerns Defendants' failure to reimburse the Hospitals for medical services provided to the Subscribers, who are or were Prime Members at the time of services, despite Defendants' contractual obligation to do so.

9.      The Hospitals are acute care hospitals located in Las Vegas, Nevada, and Overland Park, Kansas. The Hospitals provide medically necessary services, including emergency room services, to their local communities.

10.     As part of its provision of medically necessary services to the communities it serves, Sunrise contracted with non-party Anthem NV under the Anthem NV Agreement, which specifies the terms and conditions under which Sunrise will treat patients (referred to as "subscribers")[2] with Blue Cross and Blue Shield ("BCBS") health plans, and be reimbursed for that treatment. Under the

---

[2] When used generally herein, the term "subscribers" is not capitalized. When the term is used to refer to the specific patients at issue in this dispute, the defined term "Subscribers" is used.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

Anthem NV Agreement, Sunrise is entitled to be paid specified rates for the provision of medically necessary services to a subscriber. [3]

11.     Similarly, as part of its provision of medically necessary services to the communities it serves, Overland Park contracted with non-party Blue Cross and Blue Shield of Kansas City ("BCBS KC," or collectively with Anthem NV, the "Local Plans") under the Blue Cross and Blue Shield of Kansas City Hospital Network Agreement (eff. Jan. 1, 2000) (as amended, the "BCBS KC Agreement," or collectively with the Anthem NV Agreement, the "Agreements"). The BCBS KC Agreement specifies the terms and conditions under which Overland Park will treat subscribers with BCBS health plans and be reimbursed for that treatment. Under the BCBS KC Agreement, Overland Park is entitled to be paid specified rates for the provision of medically necessary services to a subscriber.

12.     However, the Agreements are far broader than the relationship between just the Hospitals, the Local Plans, and subscribers enrolled in health plans through the Local Plans. The Agreements also cover treatment that the Hospitals provide through the "Blue Cross Blue Shield Out of Area Program," "Inter-Plan Program," or "BlueCard Program," (referred to hereinafter as the "BlueCard Program") to any subscribers enrolled in any BCBS health plan, including subscribers who are insured by another state's Blue Cross Blue Shield Association ("BCBSA") licensee.

13.     Non-party California Physicians' Service d/b/a Blue Shield of California ("BS CA") is one of the BCBSA licensees for the State of California. Upon information and belief, Prime contracts with BS CA to access BS CA's provider network and benefits, including BS CA's ability to access the terms of the Agreements between the Local Plans and the Hospitals through the BlueCard Program. Specifically, on Prime's website, Prime represents to its members that Prime

---

[3] The Agreements set forth specific rates for covered services. The confidentiality provisions in the Agreements prevent Plaintiffs from reciting the rates herein. The rates also constitute Plaintiffs' proprietary information. As noted above, the Agreements, including their rate provisions, will be produced pursuant to a valid discovery request once a protective order has been entered.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

accesses the BlueCard Program through BS CA.[4] Accordingly, upon information and belief, Prime Members are also subscribers of BS CA when they receive care under the BlueCard Program.

14.    The Subscribers at issue in this dispute who are or were Prime Members received medical care at the Hospitals in Nevada and Kansas under the BlueCard Program through Prime's agreement with BS CA.

15.    The Agreements contemplate that (a) the Hospitals will provide services to subscribers of out-of-state BCBS plans through the BlueCard Program; (b) such out-of-state BCBS plans, as "Affiliates" of BCBS KC and/or "Payors" under the BCBS KC Agreement, or as "Other Payors" and the "Plans" responsible for payment under the Anthem NV Agreement, will access the discounted rates set forth in the Agreements when the Hospitals provide services to subscribers of out-of-state BCBS plans through the BlueCard Program; and (c) the out-of-state BCBS Plans, as "Affiliates" of BCBS KC and/or "Payors" under the BCBS KC Agreement, or as "Other Payors" and the "Plans" responsible for payment under the Anthem NV Agreement, are bound by the terms and conditions of the Agreements when the Hospitals provide services to their subscribers through the BlueCard Program, which terms and conditions include the obligation to pay claims in accordance with and at the rates in the Agreements.

16.    In the present case, Defendants, by participating in the BlueCard Program, agreed to be "Affiliates" of BCBS KC and/or "Payors" under the BCBS KC  Agreement and "Other Payors" and the "Plans" responsible for payment under the Anthem NV Agreement.

17.    The BCBS KC Agreement expressly provides that entities accessing the terms of the BCBS KC Agreement, including Overland Park's services and discounted reimbursement rates, through the BlueCard Program are "Affiliates" of BCBS KC and are subject to the terms of the BCBS KC Agreement, including its payment obligations, to the same extent as BCBS KC.

18.    When Defendants accessed Overland Park's services and the reimbursement rates set forth in the BCBS KC Agreement through BS CA and the BlueCard Program, Defendants became "Affiliates" bound by the terms of the BCBS KC Agreement, including its payment terms.

---

[4] *See Benefit Plan Information*, Prime Healthcare (last visited Nov. 13, 2025), https://prime-healthplan.com/benefit-plan-information/. A printout of this webpage is attached hereto as <u>Exhibit 1</u>.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

19.     Under the BCBS KC Agreement, Defendants also meet the definition of "Payor," because such definition expressly applies to BCBS KC and its "Affiliates," as well as to other BCBS plans accessing the BCBS KC Agreement.

20.     The definition of "Payors" includes third party administrators, like Keenan, and other health plans, like Prime, that access the network established under the BCBS KC Agreement.

21.     The BCBS KC Agreement requires "Payors," like "Affiliates," to reimburse Overland Park for services provided to subscribers of BCBS plans in accordance with the payment provisions and at the rates set forth in the BCBS KC Agreement.

22.     Prime, as an accessing health plan, and Keenan, as the TPA of the accessing health plan, became "Payors" under the BCBS KC Agreement when they accessed the discounted rates under the BCBS KC Agreement through BS CA under the BlueCard Program.

23.     Under the BCBS KC Agreement, Defendants—as "Affiliates" and "Payors"—accessed the terms of the BCBS KC Agreement through the BlueCard Program and are required to pay Overland Park for the services provided to the Subscribers at the rates set forth in the BCBS KC Agreement.

24.     Similarly, the Anthem NV Agreement binds Anthem NV and "Other Payors," which includes entities and other BCBS plans, accessing the terms of the Anthem NV Agreement pursuant to an agreement with Anthem NV.

25.     The definition of "Other Payor" in the Anthem NV Agreement includes participants in the BlueCard Program, like Defendants, because, under the BlueCard Program, Defendants access the terms of the Anthem NV Agreement through another BCBS plan, namely BS CA, and, upon information and belief, BS CA has either a direct or indirect agreement with Anthem NV concerning participation in the BlueCard Program.

26.     The definition of "Other Payors" health plans that access the network established under the Anthem NV Agreement.

27.     The Anthem NV Agreement states that when "Other Payors" access Sunrise's services and rates, the "Other Payors" become the "Plans" responsible for paying Sunrise for services provided to the Plans' subscribers at the rates in the Anthem NV Agreement.

28.    Prime, as an accessing health plan, and Keenan, as the TPA of the accessing health plan, became "Other Payors" under the Anthem NV Agreement when they accessed the discounted rates under the Anthem NV Agreement through BS CA under the BlueCard Program.

29.    Accordingly, under the Anthem NV Agreement, Defendants—as "Other Payors" and the "Plans" responsible for payment—accessed the terms of the Anthem NV Agreement through the BlueCard Program and are required to pay Sunrise for the services provided to the Subscribers at the rates set forth in the Anthem NV Agreement.

30.    The Hospitals' expectations of reimbursement by Defendants at the rates specified in the Agreements were reinforced by Prime's own conduct and representations, which are consistent with, if not express admissions of, Defendants being bound by the Agreements as "Affiliates," "Payors," "Other Payors," and/or the "Plans" responsible for payment of the claims. Keenan, as the TPA for Prime, is bound, expressly or impliedly, by Prime's representations and decisions concerning coverage for Prime Members.

31.    On Prime's website, Prime includes a link to BCBSA's "Find Care" tool where its members can locate care outside of California that is covered through BS CA under the BlueCard Program.[5]

32.    Using the "Find Care Outside California" tool linked on Prime's website reveals that, through BS CA and the BlueCard Program, Prime is "in-network" with the Hospitals.[6]

33.    BS CA's website explains that network provider means "[a] group of providers – including hospitals, doctors, specialists and other healthcare providers – that have agreed with Blue Shield to provide benefits for a specified amount."[7]

34.    Here, the "specified amount" is the contractual reimbursement rate set forth in the Agreements, which Defendants, as "Affiliates," "Payors," "Other Payors," and/or the "Plans"

---

[5] *See* Exhibit 1.
[6] *See Find a Doctor Near You*, Blue Cross Blue Shield (last visited Nov. 13, 2025), https://www.bcbs.com/member-services/find-a-doctor. A printout of the search results showing that the Hospitals are in-network with Prime are attached hereto as Exhibit 2.
[7] *See Common Healthcare Terms and FAQ*, Blue California (last visited Nov. 13, 2025), https://www.blueshieldca.com/en/ifp/healthcare-terms-faq. A printout of the webpage is attached hereto as Exhibit 3.

BAILEY✦KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

responsible for payment of the claims, agreed to pay by accessing the benefits of the Agreements (including discounted, in-network rates) through BS CA under the BlueCard Program.

35.    BS CA's website explains, "The BlueCard® Program links participating healthcare providers and the independent Blue Cross and Blue Shield Plans across the country and abroad with a single electronic network for claims processing and reimbursement."[8] BS CA further explains, "Once we receive your BlueCard claim, we will electronically route it to the member's Blue plan that will process the claim according to the member's benefits contract."[9]

36.    Under the BlueCard Program, the BCBS plan that insures the subscriber (referred to in BlueCard terminology as the "Home Plan") must pay for the covered services provided to its subscriber at the rates specified in the contract between the local BCBS plan (referred to as the "Host Plan") and the provider.[10]

37.    Under the BlueCard Program, the Host Plan often serves as an administrator for the subscribers' health plans when it handles claims through the BlueCard Program,[11] which is evidenced by the Host Plan charging an administration fee to the Home Plan.[12]

38.    The Host Plan also, upon information and belief, charges an access fee to the Home Plan to access the rates in the Agreement.

39.    Upon information and belief, the Host Plan and the Home Plan have a direct or indirect contractual relationship relating to their participation in the BlueCard Program (*i.e.*, the Home Plan and Host Plan may directly contract with one another to participate in the BlueCard

---

[8] *See BlueCard Program Frequently Asked Questions*, Blue California (last visited Nov. 13, 2025), https://www.blueshieldca.com/en/provider/guidelines-resources/bluecard/faqs. A printout of this webpage is attached hereto as Exhibit 4.
[9] *See id.*
[10] *See e.g., In re: Blue Cross Blue Shield Antitrust Litigation* (MDL No. 2406), 308 F. Supp. 3d 1241, 1255 (N.D. Ala. 2018) ("Through the BlueCard program, the Plans have agreed that when a contracted provider treats a patient covered by a Home Plan . . . the Home Plan will reimburse the provider at a rate which equals (at a minimum) the levels received for providers under the provider's contract with its Host Plan.").
[11] *See Health Care Serv. Corp. v. Methodist Hosps. of Dallas,* 814 F.3d 242, 246 (5th Cir. 2016) (explaining that the local BCBS plan "acts as the administrator for . . . claims arising under the BlueCard program.").
[12] *See In re: Blue Cross Blue Shield Antitrust Litigation*, 308 F. Supp. 3d at 1255 ("Under BlueCard Rules, an access fee may be charged in connection with processing BlueCard claims, but that fee can be, and is frequently, negotiated or waived.").

1 Program, or participation in the BlueCard Program may be a term of the licensing agreements
2 between BCBSA and all BCBS licensees).[13]

3     40.    Through this network of contracts, the BlueCard Program essentially operates as a
4 rental network, through which the Host Plan "rents" its contract rates with local providers to all the
5 other BCBS Home Plans.

6     41.    Here, upon information and belief, the Local Plans, as the Host Plans, and BS CA,
7 as the Home Plan, have a direct or indirect contractual relationship relating to their participation in
8 the BlueCard Program.

9     42.    Further, upon information and belief, Defendants, by contracting with BS CA for
10 participation in the BlueCard Program, agreed to stand in the place of BS CA as the Home Plan,
11 because Defendants are ultimately responsible for making all coverage, utilization management,
12 and payment decisions for the Subscribers, who are Prime Members.

13     43.    Applying the mechanics of the BlueCard Program to the present dispute, BS CA
14 would normally be the Home Plan for the Subscribers, but, because Defendants: (1) accessed the
15 BlueCard Program through BS CA; (2) bear financial responsibility for claims submitted for Prime
16 Members; and (3) are exclusively responsible for making all coverage, utilization management, and
17 payment decisions, Defendants stepped into BS CA's role–whether through a delegation,
18 assignment, or other express or implied contractual relationship with BS CA–as the Home Plan
19 with respect to services provided to Prime Members under the BlueCard Program. The Subscribers
20 who are Prime Members, received care at the Hospitals in Nevada and Kansas. The Hospitals
21 contracted with Anthem NV and BCBS KC, as the Host Plans, for all matters pertaining to their
22 provision of services to subscribers under the BlueCard Program. Accordingly, Sunrise and
23 Overland Park contacted Anthem NV and BCBS KC, respectively, for all matters pertaining to the
24 Subscribers' coverage, including submitting their claims for reimbursement. Then, upon
25 information and belief, Anthem NV and BCBS KC, acting as the administrators of the claims under
26 the BlueCard Program, reviewed the claims, determined the amount that would be payable under

27

28 [13] *See id.* ("Under BlueCard, Plans were required to make their local provider discounts available
to all Blue Members, even if they lived in another Plan's service area.").

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

the Agreements for the services Plaintiffs provided to the Subscribers, and forwarded such information to Defendants. Defendants were supposed to then apply the Subscribers' health benefits, make coverage determinations, approve or deny payment for the services at the rates set forth in the Agreements, and submit its decision and payment to Anthem NV and BCBS KC for transmission to Sunrise and Overland Park, respectively.

44.    Accordingly, and consistent with how the BlueCard Program operates, Plaintiffs expected Defendants to reimburse them for the services provided to the Subscribers at the rates specified in the Agreements, which are the rates Defendants agreed to pay as "Affiliates," "Payors," "Other Payors," and the "Plans" responsible for payment of the claims under the Agreements.

45.    Additionally, for at least some of the Subscribers at issue in this dispute, Plaintiffs received correspondence or communications directly from Defendants, as opposed to Anthem NV, BCBS KC, or BS CA, concerning the claims at issue, further evidencing Defendants' acknowledgment of their financial responsibility for the claims submitted by the Hospitals for the services rendered to the Subscribers, who are Prime Members.

46.    Defendants, however, failed to reimburse Plaintiffs for the claims submitted for the Subscribers at the rates set forth in the Agreements.

47.    Plaintiffs are authorized to assert the claims described herein on behalf of the Subscribers because upon admission to the Hospitals, each patient or their legal representative signs a form, often referred to as Conditions of Admission ("COA"), that includes an assignment of the patient's health insurance benefits (including an assignment of rights to pursue those benefits in litigation or in any other forms of dispute resolution in any forum for any type of relief) to Plaintiffs. The Subscribers signed these COA forms assigning their rights and benefits under their respective health plan to the Plaintiffs. These COA forms each contain the following provision or substantially similar language: "[p]atient assigns all his/her rights and benefits under existing polices of insurance providing coverage and payment for any and all expenses incurred as a result of services and treatment rendered by the Provider… I hereby irrevocably appoint the Provider as my

authorized representative to pursue any claims…. and/or legal remedies."[14] Further, each of the claims at issue was submitted with a "Y" in box 53 of the claim form, indicating that the claim was submitted pursuant to an assignment of benefits. At no point during the processing of any of the claims for reimbursement at issue in the present matter did Defendants deny any claims based upon or raise the existence of any anti-assignment language in the Subscribers' respective health plans.

## II.    FACTS CONCERNING PRESENT CLAIMS

48.    <u>Patient 1 – Admitted and Discharged in 2022</u>: At the time the services were rendered, Patient 1 was a 12-year-old male with a history of recurring hospitalizations due to exacerbations of Ornithine Transcarbamylase Deficiency–an inherited and fatal disorder involving the gradual buildup of toxic ammonia levels, which is generally managed with dialysis until the time of death. Patient 1 presented to Sunrise's emergency department after experiencing two weeks of progressive vomiting, lethargy, hypotension, and rising ammonia levels that failed to improve with outpatient treatment. Patient 1 was transported to Sunrise by ambulance upon a referral from his pediatrician and was admitted to Sunrise's pediatric ICU for intensive hemodynamic, ammonia, and neurologic monitoring. Patient 1 was also discovered to be positive for COVID-19 upon admission. Patient 1 gradually improved and was transferred to the main pediatric unit at Sunrise. Once Patient 1 was stabilized, he was discharged home.

49.    During Patient 1's inpatient admission, Sunrise sent Patient 1's medical records to BS CA and requested authorization for Patient 1's admission. On May 11, 2022, Sunrise contacted Anthem NV concerning the status of its authorization request and was informed that Anthem NV could not locate a policy covering Patient 1.

50.    On May 14, 2022, Sunrise timely submitted a claim for the services provided to Patient 1 to Anthem NV for forwarding to BS CA. On May 18, 2022, Sunrise learned that Patient 1 was a Prime Member and that all utilization management review requests were to be submitted to Defendants. On or about May 20, 2022, Sunrise forwarded the claim for Patient 1, as well as its request for authorization, to Defendants.

---

[14] Copies of the COA forms signed by the Subscribers, which have been redacted to protect the Subscribers' identities in accordance with The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), are attached hereto as <u>Collective Exhibit 5</u>.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

51.    Sunrise received correspondence from Anthem NV dated July 13, 2022, indicating that the claim submitted for Patient 1 was being processed and to allow an additional 20 business days for it to process. By correspondence dated July 20, 2022, Anthem NV, on behalf of Defendants, denied the claim submitted for Patient 1 on grounds that it was allegedly an "exact duplicate claim/service," without further explanation. On July 25, 2022, however, Sunrise checked the status of the claim through Availity (a web portal utilized by Anthem NV and BS CA), which reflected that the claim had been received on May 14, 2025, that it was still pending, and that additional medical records were needed. Sunrise uploaded Patient 1's medical records to Availity.

52.    On August 8, 2022, Sunrise received correspondence from Anthem NV stating that Patient 1 was insured by Prime and that Prime conducts its own medical review internally. Anthem NV directed Sunrise to contact Prime. On August 10, 2022, Sunrise contacted Prime, and a representative informed Sunrise that Prime was unable to locate medical records for Patient 1. Sunrise resubmitted Patient 1's medical records. On August 24, 2022, Sunrise contacted Anthem NV concerning the status of the claim submitted for Patient 1 and was again told to contact Prime. Upon contacting Prime, Sunrise learned that the claim for Patient 1 had been denied by Defendants on an unspecified date. Sunrise had not received a copy of the denial, and the representative agreed to send it to Sunrise in 24-48 hours, but Sunrise did not receive a copy of the denial.

53.    On September 24, 2022, Sunrise timely submitted its first-level appeal to Defendants, enclosed Patient 1's medical records, and requested a medical necessity review. Despite checking the status of the appeal multiple times between September 24, 2022, and November 3, 2022, Sunrise did not receive any updates on the appeal, until it received correspondence from Keenan dated November 2, 2022, stating that Defendants had upheld the denial of the claim.

54.    On November 19, 2022, Sunrise submitted its second-level appeal to Defendants, enclosed copies of Patient 1's medical records, and requested a medical necessity review. On December 13, 2022, Sunrise contacted Keenan for an update on the appeal and was advised that the second-level appeal had been received on November 29, 2022, and that Sunrise should allow

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

more time for processing. Sunrise received correspondence from Defendants dated January 26, 2023, stating that the denial had been upheld for lack of authorization.

55.    Later, Sunrise's claim was reviewed again by Anthem NV, and Anthem NV determined that the initial denial of Sunrise's claim based on being an "exact duplicate claim/service" was in error. On January 23, 2024, however, Anthem NV, on behalf of Defendants, informed Sunrise that the claim was denied for purported lack of authorization.

56.    The denial of the claim submitted for Patient 1 for alleged lack of authorization constituted a wrongful denial of benefits that should be reversed.

57.    First, Defendants' denial of the claim submitted for Patient 1 based on lack of authorization is incorrect. Under the Anthem NV Agreement and federal law, Sunrise is not required to obtain preauthorization for emergency services. Furthermore, Sunrise did request authorization for Patient 1's admission. Sunrise timely submitted its authorization request to Anthem NV, in accordance with standard claims processing procedure under the BlueCard Program. Sunrise also forwarded Patient 1's medical records and the authorization request to Defendants. Sunrise is not responsible for Defendants' failure to timely issue an authorization for Patient 1.

58.    Second, Sunrise repeatedly requested a medical necessity review in its appeals of Defendants' denials. Under the Anthem NV Agreement, Sunrise is entitled to a medical necessity review when Defendants deny a claim for lack of authorization, and if the services are determined to have been medically necessary, Defendants are obligated to reimburse Sunrise for the services, regardless of whether authorization was obtained. There is no evidence that Defendants conducted the required medical necessity review. If Defendants did conduct a medical necessity review, they failed to provide a sufficiently specific clinical basis for the denial. This violates federal law, which requires a health plan to provide "[t]he specific reason or reasons for the adverse determination" and "[i]f the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

statement that such explanation will be provided free of charge upon request." *See* 29 C.F.R. § 2560.503-1(g)(1)(i), (v)(B).)

59.     Third, the services provided to Patient 1 during his inpatient admission were medically necessary. Patient 1 presented to Sunrise's emergency department in critical condition, requiring immediate medical stabilization for low blood pressure and toxic ammonia levels. Patient 1's admission to the pediatric ICU was medically necessary and appropriate, which is evidenced by the fact that it met InterQual criteria.[15] Furthermore, at least some portion of the billed services constituted emergency and post-stabilization care services for which Defendants are required to pay under federal law. *See* 42 CFR § 438.114. Accordingly, Patient 1's inpatient admission was medically necessary, and Sunrise is entitled to payment for the services provided to Patient 1 at the inpatient reimbursement rates set forth in the Anthem NV Agreement.

60.     Finally, Defendants suffered no prejudice due to any alleged lack of authorization because Sunrise rendered emergent and medically necessary care to Patient 1, and Defendants have never challenged the appropriateness of the care provided to Patient 1.

61.     In sum, Sunrise provided medically necessary, covered services to Patient 1 and is entitled to payment in full for those services. According to the terms of the Anthem NV Agreement, Sunrise is entitled to be paid $26,095.00 for the emergent and medically necessary, covered services it provided to Patient 1.

62.     Patient 2 – Admitted and Discharged in 2021: At the time services were rendered, Patient 2 was a 60-year-old male with a medical history of diabetes mellitus, hypertension, and chronic kidney disease. Patient 2 presented to Sunrise's emergency department with complaints of worsening bilateral lower extremity edema up to his abdomen despite taking his daily Lasix prescription. He was found to have an acute on chronic kidney disease with elevated creatinine levels, possible congestive heart failure, and congestion and pleural effusions. Patient 2 was admitted for observation with a treatment plan including telemetry monitoring, intravenous

---

[15] InterQual criteria are guidelines used by health plans and healthcare providers as a tool to evaluate the appropriate level of care (inpatient, observation, or outpatient) for hospitalized patients. The guidelines are not determinative of medical necessity and are not a substitute for the professional medical judgment of a treating physician.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

diuretics, glycemic control, renal studies, echocardiogram and nephrology consultation. Subsequently, Patient 2's admission status was converted to inpatient by physician order, as Patient 2 remained edematous with persistent elevated creatinine levels. Patient 2 underwent a renal biopsy, followed by placement of a temporary hemodialysis access catheter, and a laparoscopic peritoneal dialysis catheter. He received post-operative management with hemodialysis treatments and coordination of outpatient peritoneal dialysis services. Once medically stable, Patient 2 was discharged.

63.    Patient 2 presented at Sunrise with coverage under a BS CA health plan. Sunrise timely provided notice of admission to BS CA within 24 hours of Patient 2's admission. On September 15, 2021, Sunrise called BS CA to check on the status of its authorization request and was transferred to Prime.

64.    By correspondence dated September 16, 2021, September 17, 2021, and September 22, 2021, Prime repeatedly denied the authorization request for Patient 2's admission due to alleged late notification. On September 23, 2021, Sunrise called Prime, and a representative of Prime informed Sunrise that authorization was denied due to alleged late notification and that no peer-to-peer review or reconsideration was available.

65.    On September 29, 2021, Sunrise timely submitted its claim for the medically necessary services provided to Patient 2 to Anthem NV for forwarding to Prime. On or about October 21, 2021, Sunrise contacted Anthem NV, and an Anthem NV representative informed Sunrise that the claim was received and pending review by the Home Plan (presumably, Prime). On November 17, 2021, Sunrise uploaded additional medical records to Availity. By correspondence dated November 17, 2021, Anthem NV, on behalf of Prime, denied the claim submitted for Patient 2 for lack of authorization.

66.    On December 8, 2021, Sunrise timely submitted its first-level appeal to Prime, enclosed a copy of Patient 2's medical records, and requested a medical necessity review. On or about January 1, 2022, Sunrise spoke with a representative of Prime who confirmed receipt of the appeal and requested that additional documents be submitted, which Sunrise submitted on or about

January 29, 2022. On February 9, 2022, Sunrise spoke with a representative of Prime who stated that Prime upheld the denial on the basis that the services provided were not authorized.

67.    On March 3, 2022, Sunrise timely submitted its second-level appeal to Anthem NV for forwarding to Prime, enclosed a copy of Patient 2's medical records and requested a medical necessity review. On or about March 28, 2022, Sunrise spoke with a representative of Anthem NV who confirmed receipt of the appeal and stated it was still pending review. On or about May 11, 2022, Sunrise contacted Anthem NV for an update on the appeal, and in response, on May 21, 2022, Sunrise was directed to contact Keenan regarding the appeal.

68.    On June 2, 2022, Sunrise resubmitted its second-level appeal to Defendants. On July 5, 2022, Sunrise spoke with a representative of Prime who stated the appeal was received and was still being processed. By correspondence dated August 22, 2022, Prime upheld the denial based on alleged lack of timely notification.

69.    The denial of Sunrise's claim for services rendered to Patient 2 on the basis of a purported lack of authorization or late notification of admission constituted a wrongful denial of benefits and should be reversed.

70.    First, Defendants' denial of the claim submitted for Patient 2 based upon a purported lack of authorization is incorrect. Under the Anthem NV Agreement and federal law, Sunrise is not required to obtain preauthorization for emergency services. Furthermore, Sunrise did timely notify Defendants of and request authorization for Patient 2's admission.

71.    Second, Sunrise repeatedly requested a medical necessity review in its appeals of Defendants' denials. Under the Anthem NV Agreement, Sunrise is entitled to a medical necessity review when Defendants deny a claim for lack of authorization, and if the services are determined to have been medically necessary, Defendants are obligated to reimburse Sunrise for the services, regardless of whether authorization was obtained. There is no evidence that Defendants conducted the required medical necessity review. Alternatively, if Defendants did conduct a medical necessity review, they failed to provide a sufficiently specific clinical basis for the denial. This violates federal law, which requires a health plan to provide "[t]he specific reason or reasons for the adverse determination" and "[i]f the adverse benefit determination is based on a medical necessity or

experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request." *See* 29 C.F.R. § 2560.503-1(g)(1)(i), (v)(B).)

72.    Third, the services provided to Patient 2 during his inpatient admission were medically necessary. Patient 2 presented to Sunrise's emergency department with acute chronic kidney disease with elevated creatinine levels, possible congestive heart failure, and congestion and pleural effusions. Patient 2 underwent a renal biopsy, followed by a temporary hemodialysis access catheter, and a laparoscopic peritoneal dialysis catheter was placed. Furthermore, at least some portion of the billed services constituted emergency and post-stabilization care services for which Defendants are required to pay under federal law. *See* 42 CFR § 438.114. Accordingly, Patient 2's inpatient admission was medically necessary, and Sunrise is entitled to payment for the services provided to Patient 2 at the inpatient reimbursement rates set forth in the Anthem NV Agreement.

73.    Finally, Defendants suffered no prejudice due to any alleged lack of authorization because Sunrise rendered medically necessary care to Patient 2, and Defendants have never challenged the appropriateness of the care provided to Patient 2.

74.    In sum, Sunrise provided medically necessary services to Patient 2 and is entitled to payment in full for those services. According to the terms of the Anthem NV Agreement, Sunrise is entitled to be paid $64,228.00 for the medically necessary services provided to Patient 2.

75.    <u>Patient 3 – Admitted and Discharged in 2022</u>: At the time services were rendered, Patient 3 was a 68-year-old male with a history of sick sinus syndrome, pacemaker implantation, atrial fibrillation with a high risk of congestive heart failure, hypertension, diabetes, stroke, recurrent major bleeding, and transient ischemic attacks who presented to Overland Park for a left atrial appendage occlusion, following a previous atrial fibrillation ablation and electrical isolation of the left atrial appendage. At Overland Park, Patient 3 underwent a left atrial appendage occlusion with implantation of an amulet device. Following the procedure, Patient 3 was admitted for observation but was later admitted as an inpatient per his physician's orders and placed on bed rest and mechanical prophylaxis of deep vein thrombosis. During his inpatient admission, Patient 3's

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1  vital signs, cardiac rhythm, and incision were monitored. On the day after his procedure, Patient 3
2  was discharged home in stable condition.

3      76.    Prior to Patient 3's procedure, Overland Park learned that Prime authorized Patient
4  3's procedure without a level of care specified. Following Patient 3's procedure and inpatient
5  admission, Overland Park submitted a notice of admission and Patient 3's medical records to Prime.
6  On the day of Patient 3's discharge, Overland Park contacted Prime, and a representative of Prime
7  requested that Overland Park submit updated medical records for Patient 3 to Prime, which
8  Overland Park did. Overland Park contacted Prime again, and a representative of Prime informed
9  Overland Park that its request for authorization of Patient 3's inpatient admission was up for
10  dismissal based on a purportedly missing discharge summary for Patient 3, but the representative
11  stated that Prime's medical director would review the request for authorization.

12      77.    Several days later, Overland Park contacted BS CA concerning authorization for
13  Patient 3's inpatient admission. BS CA routed Overland Park to Prime, and a representative of
14  Prime informed Overland Park that Patient 3's inpatient admission was authorized for one day. By
15  correspondence dated February 25, 2022, Prime informed Overland Park that Patient 3's admission
16  was authorized at an observation level of care.

17      78.    On February 25, 2022, Overland Park timely submitted a claim for the services
18  provided to Patient 3 to BS CA for forwarding Prime. On April 12, 2022, Overland Park
19  contacted BS CA concerning the claim submitted for Patient 3, and a representative of BS CA
20  informed Overland Park that BS CA no longer accepted paper claims and that the claim needed to
21  be resubmitted electronically. On April 18, 2022, Overland Park resubmitted the claim
22  electronically to BS CA for forwarding to Prime. On June 2, 2022, Overland Park contacted BS CA
23  concerning the status of the claim, and a representative of BS CA requested an itemized bill for the
24  services provided to Patient 3. On June 3, 2022, Overland Park resubmitted the claim for Patient 3
25  again. On June 7, 2022, BS CA, on behalf of Prime, denied the claim in full for a purported lack of
26  authorization.

27      79.    On or about July 6, 2022, Overland Park submitted its first-level appeal to Prime.
28  On August 2, 2022, Overland Park contacted BCBS KC concerning the status of the appeal, and a

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

representative of BCBS KC informed Overland Park that no appeal was on file for Patient 3 and requested that Overland Park submit the appeal by facsimile. On August 3, 2022, Overland Park resubmitted the appeal. On September 2, 2022, Overland Park confirmed Prime received the appeal. On or about October 17, 2022, Overland Park received correspondence from BCBS KC stating that the claim for Patient 3 had been processed correctly in accordance with Prime's determination and that no adjustment would be made. On October 25, 2022, Overland Park contacted BCBS KC, and a representative of BCBS KC informed Overland Park that the denial of the claim had been upheld, that all appeal rights had been exhausted, and that the remaining amount owed was Patient 3's responsibility.

80.    On November 16, 2022, Overland Park resubmitted the claim for Patient 3 and received no response.

81.    The denial of Overland Park's claim for services rendered to Patient 3 based on a purported lack of authorization constituted a wrongful denial of benefits and should be reversed.

82.    First, Overland Park requested a medical necessity review in its appeal of Prime's denial. Under the BCBS KC Agreement, Overland Park is entitled to a medical necessity review when Prime denies a claim for lack of authorization, and if the services are determined to have been medically necessary, Prime is obligated to reimburse Overland Park for the services, regardless of whether authorization was obtained. There is no evidence that Prime conducted the required medical necessity review. Alternatively, if Prime did conduct a medical necessity review, it failed to provide a sufficiently specific clinical basis for the denial. This violates federal law, which requires a health plan to provide "[t]he specific reason or reasons for the adverse determination" and "[i]f the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request." *See* 29 C.F.R. § 2560.503-1(g)(1)(i), (v)(B).)

83.    Second, the services provided to Patient 3 during his inpatient admission were medically necessary, as evidenced by Patient 3's medical records, the fact that Patient 3's admission

met InterQual criteria, and because Patient 3 underwent a left atrial appendage occlusion, which is listed on the CMS Inpatient Only List (Addendum E).[16] Additionally, Prime authorized Patient 3's admission at a lower level of acuity but still denied payment for the claim in full. Accordingly, Patient 3's inpatient admission was medically necessary, and Overland Park is entitled to payment for the services provided to Patient 3 at the inpatient reimbursement rates set forth in the BCBS KC Agreement.

84.     Finally, Prime suffered no prejudice due to any alleged lack of authorization because Overland Park rendered medically necessary care to Patient 3, and Prime has never challenged the appropriateness of the care provided to Patient 3.

85.     In sum, Overland Park provided medically necessary services to Patient 3 and is entitled to payment in full for those services. According to the terms of the Agreement, Overland Park is entitled to be paid $32,982.59 for the medically necessary services provided to Patient 3.

## C.    CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT (AGREEMENTS)

86.     The foregoing paragraphs are incorporated by reference.

87.     As alleged above, Plaintiffs are parties to the Agreements, which provide the terms and conditions under which Plaintiffs will treat subscribers with BCBS health plans and be reimbursed for that treatment.

88.     Defendants are bound by the Agreements as "Affiliates," "Payors," "Other Payors," and/or the "Plans" responsible for paying the claims submitted by the Hospitals for the Subscribers.

89.     Specifically, Defendants are bound by the BCBS KC Agreement because the BCBS KC Agreement expressly applies to "Affiliates," which includes entities accessing the terms of the

---

[16] The CMS Inpatient Only List is a list of medical procedures that the Centers for Medicare & Medicaid Services ("CMS") will only cover if they are performed in an inpatient hospital setting. The Inpatient Only List ensures that complex or high-risk procedures are performed in a safe and monitored environment and prevents these procedures from being performed in outpatient settings, such as surgery centers or doctors' offices where medically necessary support may not be available. While the Inpatient Only List is only applicable to claims made to CMS, it is often used as an industry-wide guide to assess which procedures are sufficiently complex such that they should only be performed on an inpatient basis.

BAILEY✧KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

BCBS KC Agreement through the BlueCard Program. When "Affiliates" access the terms of the BCBS KC Agreement, they are obligated to reimburse Overland Park at the rates set forth therein.

90.    Additionally, Defendants are bound by the BCBS KC Agreement because the BCBS KC Agreement applies to "Payors," which includes Affiliates and/or any other entity accessing Overland Park's services and the discounted reimbursement rates in the BCBS KC Agreement. The term "Payors" includes TPAs and health insurance plans, like Keenan and Prime. When "Payors" access the terms of the BCBS KC Agreement, they are obligated to reimburse Overland Park at the rates set forth in the BCBS KC Agreement.

91.    Similarly, Defendants are bound by the Anthem NV Agreement because the Anthem NV Agreement applies to "Other Payors," which includes other entities and other BCBS plans accessing Sunrise's services and discounted reimbursement rates in the Anthem NV Agreement. When "Other Payors" access the terms of the Anthem NV Agreement, they are obligated as the "Plans" responsible for payment to reimburse Sunrise at the rates set forth in the Anthem NV Agreement.

92.    By participating in the BlueCard Program, Defendants accessed the Agreements when their Subscribers received medical care at the Hospitals at the discounted rates set forth in the Agreements. Defendants processed the claims submitted by the Hospitals for the Subscribers and communicated with Plaintiffs concerning such claims, evidencing the fact that Defendants accessed and relied upon the Agreements. Accordingly, and as expressly provided in the Agreements, Defendants are bound by the terms of the Agreements, including their payment terms.

93.    Defendants' intent to be bound by the terms of the Agreements is also demonstrated by the representations made on Prime's and BS CA's website that the Hospitals are "in-network" with Prime through BS CA and the BlueCard Program.

94.    Additionally, upon information and belief, the BlueCard Program operates by all individual state licensees of the BCBSA entering into contracts with one another and/or with the BCBSA that allow licensees, such as BS CA, nation-wide access to in-network reimbursement rates of other BCBS health plans, such as the Local Plans, for the licensees' members who receive medical services while living or traveling outside of the geographic boundaries of the Home Plan.

In fact, upon information and belief, each licensee must make its in-network rates available to all other BCBS-branded plans. The Host Plan, upon information and belief, charges the Home Plan an access fee for access to the local rates and an administrative fee for processing claims. In effect, these nation-wide contracts provide a means by which individual licensees of the BCBSA, such as the Local Plans, assign their rights and locally negotiated payment rates under contracts with health care providers, such as Plaintiffs, to other licensees of the BCBSA, such as BS CA, thus allowing those licensees access to in-network rates, including the substantial in-network discounts off of billed charges built into such rates. Here, Defendants stepped into BS CA's place as the Home Plan. The assigning BCBSA licensee, which in this case are the Local Plans, then acts as the claims administrator and forwards the claims to the Home Plan, which in this case is Prime, for final determination and payment.

95.    Under this arrangement, the BlueCard Program is essentially a rental network, and when there are multiple contracts between multiple parties in the rental network context, the agreements may be construed as one contract between the multiple parties.

96.    In this case, the Agreements between the Plaintiffs and the Local Plans and any agreement between the Local Plans and BS CA, whether direct or indirect through the BCBSA, should be construed as one contract, such that Prime, through its agreement with BS CA, is bound by the terms of the Local Plans' Agreements with the Hospitals, to which BS CA has assented and agreed.

97.    Defendants knew that by participating in the BlueCard Program through BS CA, that Defendants would be bound by the payment terms of any local BCBS plan's contract under which it accesses in-network rates, including the Local Plans' Agreements with the Hospitals.

98.    Accordingly, there was a meeting of the minds between Plaintiffs and Defendants as to the binding nature of the Agreements, as well as the material terms of the Agreements as they relate to both parties, including the payment terms of the Agreements.

99.    Under the Agreements, Plaintiffs are entitled to be paid specified rates for the provision of medically necessary, covered services to the Subscribers.

100.    Plaintiffs provided medically necessary, covered services to each of the Subscribers, and those services are payable under the terms of the Agreements. Prime, through BS CA, consented to and received the benefit of the services and the discounted rates for the services and agreed to pay for such services at the rates set forth in the Agreements by virtue of its participation in the BlueCard Program.

101.    Defendants breached the Agreements by failing to pay in full for the medically necessary, covered services Plaintiffs provided to the Subscribers described above.

102.    Plaintiffs suffered damages as a direct and proximate result of Defendants' breach of the Agreements; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $123,305.59 under the Agreements for the medically necessary, covered services that Plaintiffs provided to the Subscribers.

### COUNT II – FAILURE TO COMPLY WITH HEALTH BENEFIT PLAN IN VIOLATION OF ERISA

103.    The foregoing paragraphs are incorporated by reference.

104.    As explained above, Plaintiffs provided medically necessary covered services to the Subscribers described above, all of whom are or were Prime Members. Plaintiffs are therefore entitled to be paid the amounts due under the Agreements for that care.

105.    As set forth above, Defendants are bound by the Agreements as "Affiliates," "Payors," "Other Payors," and/or the "Plans" responsible for payment of the claims. Upon information and belief, Plaintiffs are also entitled to payment under the terms of each Subscriber's health plan, because the Hospitals' services were medically necessary covered services that are covered by each Subscriber's health plan.

106.    Upon information and belief, some or all of the Subscribers whose hospital admissions are at issue are subscriber(s) to an employer-sponsored health insurance policy through Prime that Keenan administers or underwrites. Thus, ERISA governs the Subscribers' health plans.

107.    Plaintiffs are entitled to enforce the terms of the Subscribers' health plans as the Subscribers' assignee under 29 U.S.C. § 1132(a)(1)(B). Upon admission to the Hospitals, each patient (or their legal representative) signs a COA form, which includes an assignment of the patient's health insurance benefits (including an assignment of rights to pursue those benefits) to

Plaintiffs. Each of the claims at issue was submitted with a "Y" in box 53 of the claim form, indicating that the claim was submitted pursuant to an assignment of benefits.

108.    When Plaintiffs appealed each of the wrongful denial of benefits described above, they requested copies of the relevant health plan documents along with a statement of the plan's review procedures and time limits applicable to such review procedures, including any contractual limitations and any plan provisions upon which Defendants relied for their denial. Defendants did not provide the requested health plan documents, plan provisions, or otherwise advise Plaintiffs of contractual limitations or other relevant provisions from the health plan documents at any point during the claims adjudication or appeals process. Defendants did not inform Plaintiffs of any purported anti-assignment provisions in the Subscribers' benefit plans.

109.    As explained above, Plaintiffs provided medically necessary services to each of the Subscribers at issue. Upon information and belief, those services qualify as covered services under the Subscribers' health plans, and Defendants are therefore obligated to pay Plaintiffs for those services.

110.    As explained above, Defendants failed to pay Plaintiffs for the covered services that it provided to these Subscribers. Defendants' wrongful denial of benefits for the medically necessary hospital services that Plaintiffs provided to these Subscribers breached the terms of each Subscriber's health plan, under which Plaintiffs have standing to sue through the Subscribers' assignments of benefits and rights via the COA forms that they (or their legal representative) executed upon admission to the Hospitals.

111.    As a proximate result of Defendants' breach of these Subscribers' health plans, Plaintiffs have been damaged in an amount in excess of the jurisdictional requirements of this Court. Plaintiffs are entitled to recover payment in an amount not less than $123,305.59 for the medically necessary, covered services they provided to these Subscribers as set forth above.

### COUNT III – BREACH OF CONTRACT (FOR HEALTH PLANS NOT SUBJECT TO ERISA)

112.    The foregoing paragraphs are incorporated by reference.

113.     Alternatively, Plaintiffs provided medically necessary covered services to each of the Subscribers whose hospital admissions are at issue, upon information and belief, and those services are covered under the terms of each Subscriber's respective health plan.

114.     Plaintiffs are entitled to recover payment under the plan(s) under a common law claim for breach of contract.

115.     Each health plan is a contract between the Subscriber and Prime, under which Prime agrees to cover medically necessary covered services that the Subscriber receives.

116.     Plaintiffs performed their obligations under the Subscribers' health plans by providing medically necessary covered services to each Subscriber.

117.     Defendants breached each of the Subscriber's health plans by failing to issue payment to Plaintiffs at the rates set forth in the Agreements for the medically necessary, covered services that Plaintiffs provided.

118.     Plaintiffs have standing to sue for breach of contract for the Defendants' failure to pay for these Subscribers' hospital admissions because each Subscriber assigned their benefits and rights under the health plan to Plaintiffs.

119.     Plaintiffs suffered damages due to Defendants' breach of each Subscriber's health plan; specifically, Plaintiffs are entitled to be reimbursed in an amount not less than $123,305.59 under the Agreements for the medically necessary covered services that Plaintiffs provided.

### COUNT IV – IMPLIED-IN-FACT CONTRACT

120.     The foregoing paragraphs are incorporated by reference.

121.     Alternatively, if Defendants are not bound by the terms of the Agreements as "Affiliates," "Payors," "Other Payors," or "Plans," Plaintiffs are entitled to be reimbursed for the services provided to the Subscribers pursuant to an implied-in-fact contract existing between Plaintiffs and Defendants by reason of Defendants' participation in the BlueCard Program through BS CA.

122.     As participants in the BlueCard Program, Plaintiffs, the Local Plans, and BS CA agreed and understood that: (1) Plaintiffs would provide services to subscribers of out-of-state BCBS plans, including subscribers of BS CA; (2) Plaintiffs would submit claims to the Local Plans

for forwarding to BS CA for services provided to BS CA's subscribers, and (3) BS CA would reimburse Plaintiffs at the rates specified in Plaintiffs' Agreements with the Local Plans.

123.    By contracting with BS CA to participate in the BlueCard Program, Defendants understood and agreed that, based on how the BlueCard Program operates, they would be obligated to reimburse Plaintiffs at the rates set forth in the Agreements. Defendants further agreed that they would step into the place of BS CA as the Home Plan.

124.    Defendants' intent to be bound by an implied-in-fact contract with Plaintiffs is evidenced by Defendants' conduct, in that Defendants participated in the adjudication of these claims, communicated with Plaintiffs regarding the claims, and reviewed and adjudicated appeals.

125.    Defendants' intent to be bound by an implied-in-fact contract with Plaintiffs is also demonstrated by the representations made by Prime that the Hospitals are "in-network" with Prime through BS CA under the BlueCard Program, which BS CA explains as meaning Prime has a contract with Plaintiffs.

126.    Accordingly, there was a meeting of the minds between Plaintiffs and Defendants as to the binding nature of the implied-in-fact contract, as well as the material terms of the contract as they relate to both parties.

127.    Plaintiffs and Defendants understood Defendants to be bound to reimburse Plaintiffs according to the terms of the Agreements by reason of their participation in the BlueCard Program and by Prime's own conduct and representations.

128.    In reliance on the implied-in-fact contract formed between Plaintiffs and Defendants by reason of their participation in the BlueCard Program, Plaintiffs provided medical services to the Subscribers with the expectation that Defendants would reimburse Plaintiffs for such services according to the terms of the Agreements.

129.    By denying claims for services provided by Plaintiffs to the Subscribers, Defendants have breached the implied-in-fact contract existing between Plaintiffs and Defendants by reason of their participation in the BlueCard Program.

130.    Plaintiffs have suffered damages as a direct and proximate result of Defendants' breach of the implied-in-fact contract; specifically, Plaintiffs are entitled to be reimbursed in an

amount not less than $123,305.59 for the medically necessary, covered services Plaintiffs provided to the Subscribers, which are or were Prime Members.

<b>Count V – Unjust Enrichment</b>

131.    The foregoing paragraphs are incorporated by reference.

132.    Alternatively, if Defendants are not bound by the Agreements, Plaintiffs are entitled to reimbursement based on unjust enrichment.

133.    Plaintiffs provided emergency medical services to two of the Subscribers.

134.    Plaintiffs had an independent legal duty under both state and federal law to provide emergency care to the Subscribers. *See* 42 C.F.R. § 438.114; Nev. Rev. Stat. Ann. § 439B.410.

135.    By providing emergency medical care to the Subscribers, care for which Defendants are obligated to pay under federal law, *see* 42 C.F.R. § 438.114, Plaintiffs conferred a benefit upon Defendants.  Moreover, by providing such emergency medical care at the substantially discounted "in-network" rates (rates which Defendants specifically sought out when they participated in the BlueCard program), Plaintiffs further conferred a substantial benefit on Defendants–the parties obligated to pay for such services.

136.    At all material times, Defendants were aware that Plaintiffs provided emergency medical services to the Subscribers and that they have failed to pay any amounts due and owing to Plaintiffs for such services.

137.    Plaintiffs did not balance bill the Subscribers after Defendants' denials of the claims submitted by Plaintiffs for the services provided to the Subscribers.

138.    It is unjust for Defendants to benefit from Plaintiffs' obligation to provide emergency medical services to the Subscribers, while choosing to pay nothing for such services.

139.    Accordingly, Defendants are obligated to reimburse Plaintiffs for the reasonable value of the services rendered.

<b>Conditions Precedent</b>

140.    All conditions precedent have been performed or have occurred.

<b>Attorneys' Fees</b>

141.    The foregoing paragraphs are incorporated by reference.

142.    Plaintiffs are entitled to an award of attorneys' fees under Nev. Rev. Stat. Ann. § 18.010.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury of the above-styled action for all claims for which a jury is available.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

1.    An award of damages in excess of $75,000 for the amount due under the Agreements and the terms of the Subscribers' health plans;

2.    Reasonable attorneys' fees and court costs; and

3.    Such other and further relief to which the Plaintiffs may be entitled.

DATED this 14th day of November, 2025.

BAILEY❖KENNEDY

By: /s/ Joshua M. Dickey
JOSHUA M. DICKEY
PAUL C. WILLIAMS

*Attorneys for Plaintiffs*